UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
DR. DUSHAN KOSOVICH,                  :
                                      :
            Plaintiff,                :      09 Civ. 6992 (JSR)
                                      :
            -v-                       :      MEMORANDUM ORDER
                                      :
METRO HOMES, LLC, DEAN S. GEIBEL,     :
PAUL E. FRIED, DONALD J. TRUMP, THE   :
TRUMP ORGANIZATION, INC., UBS         :
FINANCIAL SERVICES, INC, KENNETH      :
KAVANAGH, METRO HARBORSPIRE, LLC,     :
METRO HARBORSPIRE GM, LLC, and VECTOR :
URBAN RENEWAL ASSOCIATES, LLP,        :
                                      :
            Defendants.               :
------------------------------------ x

JED S. RAKOFF, U.S.D.J.


        By Order dated November 30, 2009, the Court granted

defendants' motions to dismiss the complaint with prejudice.  This

Memorandum Order provides the reasons for this ruling and directs

entry of final judgment.

        On August 6, 2009, plaintiff, Dr. Dushan Kosovich, brought

this action alleging securities fraud and various state-law claims in

connection with his investment in a real estate project known as

"Harborspire."  This project contemplated the financing and

construction of two condominium towers in Jersey City, New Jersey.

Plaintiff's complaint levies allegations against various groups of

defendants.  The first group (the "Metro Homes Defendants") consists

of various entities that were involved in the project's development

and financing, including Metro Homes, LLC[1] ("Metro Homes," the

_____

[1] The numerous typographical errors in plaintiff's complaint
-- which, for example, refers to this entity as "Metro Homes,

project's developer); Metro Harborspire, LLC ("Harborspire," the
entity that made the securities offering at issue); Metro Harborspire
GM, LLC (the General Manager of Harborspire); and Vector Urban
Renewal Associates GM, LLC (the entity that owned the land where the
project was built) -- along with two of the principals of these
entities, Dean S. Geibel and Paul E. Fried.[2]  The second group (the
"UBS Defendants") consists of UBS Financial Services, Inc. ("UBS"),
and Kenneth Kavanagh, a former UBS broker, who acted as plaintiff's
investment advisors and are alleged to have induced him to make the
investment in Harborspire.  The third group (the "Trump Defendants")
consists of Donald J. Trump and The Trump Organization, Inc., who are
alleged to have lent the Trump name to the project in promotional and
advertising materials.

    The primary claim in plaintiff's complaint alleges securities
fraud, in violation of Section 10(b) of the Securities Exchange Act
of 1934 and Rule 10b-5 promulgated thereunder, relating to his
investment in the Harborspire project.  According to the complaint,
plaintiff, a Serbian-born psychiatrist who is a naturalized U.S.
citizen, is "completely naive and uninformed as to financial

---

LLLC" -- have made it necessary for the Court to consult other
pleadings and documents referenced therein in order to determine
the correct names of the corporate defendants.

    [2] According to the Metro Homes defendants, Fried is no
longer an employee of Metro Homes and has not been served with
the complaint.  See Metro Homes/Trump Mem. at 1 n.1.
Nonetheless, as the reasons for dismissal apply equally to him as
to others, the complaint against him is dismissed with prejudice.

matters." Compl. ¶ 21.  Plaintiff held an investment account with UBS, and was informed of Harborspire by Kavanagh, who encouraged him to invest in the project.  Id. ¶ 15.  According to plaintiff, UBS and Kavanagh represented that his investment would be in the nature of a loan that would earn fixed interest in the amount of 15% per annum over three years, and that his principal would be returned at that time.  Id. ¶¶ 16, 27.  He was not informed that the investment would be divided into two "classes" of interests.  Id. ¶ 16.  Relying on these alleged representations made by the UBS Defendants, as well as certain offering materials provided by the Metro Homes Defendants and the Trump Defendants' association with this project, plaintiff committed to invest $1,000,855.67 in the project.  Id. ¶¶ 21, 24. Plaintiff in fact invested that amount in 2005, after taking out a mortgage on his apartment to obtain the necessary funds.  Id. ¶¶ 24, 26.

The returns on his investment, however, fell far short of what was promised.  In January 2006, July 2006, and January 2007, plaintiff received partial interest payments of approximately $22,000 (far less than the allegedly promised annual return of approximately $150,000 a year) in what he characterizes as a "calculated gesture" by defendants.  Id. ¶¶ 28-30.  He received no other interest payments, and his principal has not been returned.  Id. ¶ 30.  On information and belief, the project has generated no profits, nor was the project generating any revenue at the time plaintiff was

solicited to invest or at the time the partial interest payments were made.  Id. ¶¶ 52, 54.[3]

   Plaintiff alleges that all defendants engaged in securities fraud in connection with the solicitation of his ill-fated investment.  With respect to the UBS Defendants, the complaint alleges that they knowingly misrepresented his investment as a fixed-interest loan, and the complaint can be read to suggest that they were motivated to do so based on "commissions" and "payments" tendered by the Metro Homes Defendants.  Id. ¶¶ 31, 50, 57.  With respect to the Metro Homes Defendants, the complaint alleges similar misrepresentations and nondisclosures as to the risks associated with the investment.  Specifically, plaintiff complains that a brochure prepared by the Metro Homes defendants to solicit investments (the "Brochure," which is attached to the complaint) contained misleading projections of profits.  Id. ¶ 18.  He also identifies misrepresentations or omissions contained in a private placement memorandum ("PPM") associated with the investment, including a lack of projections of anticipated earnings by Harborspire, insufficient disclosure of Trump's participation in the project, and a failure to disclose the total amount solicited in the offering, the distributions of proceeds from the offering, and the alleged payments by the Metro Homes Defendants to the Trump and UBS defendants.  Id. ¶

---

[3] In fact, according to plaintiff's memorandum in opposition to the motions to dismiss, only one of the two towers was constructed.  Pl. Mem. Opp. at 10.

33.  The complaint also contains allegations that the Harborspire securities were unlawfully unregistered and that plaintiff did not qualify as a "sophisticated investor" who could participate in such an offering.  Id. ¶¶ 34-35.[4]  Finally, with respect to the Trump Defendants, plaintiff alleges that Trump licensed his brand to the Harborspire project, id. ¶ 47, and permitted the "promiscuous and indiscriminate use of his name and reputation to create the impression by the general public that Trump was intimately connected and involved with the Project as a principal," which impressed plaintiff and influenced him to invest in the project.  Id. ¶¶ 47-49.

Based on the foregoing allegations, plaintiff alleges both federal securities fraud and state-law "misrepresentation and fraud" in, respectively, Counts I and III of the complaint.  In addition, in Count II, the complaint alleges that defendants breached an agreement between Kosovich and "Metro [Homes], by way of UBS Financial, . . . whereby Kosovich agreed to advance the sum of $1,000,868 to Metro Homes, Geibel and Fried" in exchange for these defendants' payment of annual interest of 15%, id. ¶ 36; in Count IV, the complaint alleges "monies loaned" based on what plaintiff characterizes as a "loan" to defendant, id. ¶¶ 61-63; and in Count V, the complaint alleges a claim for "monies had and received and unjust enrichment" arising from defendants' retention of the initial investment and unpaid interest, id. ¶¶ 65-68.

---

[4] The complaint contains two paragraphs numbered "34," both of which relate to these allegations.

The above recitation construes plaintiff's complaint generously and accepts its well-pleaded factual allegations as true. To survive a motion to dismiss, these factual allegations, taken together, must "plausibly give rise to an entitlement to relief." Iqbal v. Ashcroft, 129 S. Ct. 1937, 1950 (2009).  In assessing whether this standard has been met, however, the Court is not required to assume the truth of the numerous conclusory legal assertions presented in the complaint.  Id.  Nor must the Court ignore documents incorporated into the complaint by reference, or documents not referenced in the complaint but that plaintiff "either possessed or knew about and upon which [it] relied in bringing the suit."  Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).

To state a claim for securities fraud in violation of Section 10(b) and Rule 10b-5, "plaintiffs must allege that [the defendants] '(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury.'"  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005).  Before, however, turning to the analysis of the elements of plaintiff's securities fraud claim, the Court notes that plaintiff's complaint is patently deficient in failing to plead facts with any specificity or particularity.  The general rule that fraud claims must be pleaded with particularity "is applied assiduously to securities fraud," id. at 168; accordingly, allegations of fraud "ought to specify the time, place, speaker, and

content of the alleged misrepresentations," <u>DiVittorio v. Equidyne</u>
<u>Extractive Indus., Inc.</u>, 822 F.2d 1242, 1247 (2d Cir. 1987); <u>accord</u>
15 U.S.C. § 78u-4(b)(1) (codifying heightened pleading requirements
for securities fraud actions). Here, however, the complaint's
allegations are largely against "defendants" generally, and the
complaint repeatedly fails to identify who was responsible for making
each alleged misrepresentation or omission, far less specifies the
precise content of the alleged misstatements or explains why they are
fraudulent. Many of the allegations in the complaint are, indeed,
utterly inscrutable, particularly those relating to the Trump
Defendants. For example, the complaint alleges that an agreement
existed between Metro Homes and "Trump Development," Compl. ¶ 47, an
entity that is not a named defendant, but fails to make any
allegations against The Trump Organization, which is listed in the
case's caption. And although the complaint alleges Trump's
involvement in the project, it does not identify any statements made
by Trump or Trump-related entities upon which plaintiff relied --
beyond the mere fact that Trump licensed his name to the project.

However, even if some of the defects in this respect could be
cured by granting leave to replead, no such leave is appropriate
here, because the securities fraud allegations are so substantively
flawed they must be dismissed with prejudice. To begin with,
plaintiff's core securities fraud claims -- those alleging that
defendants represented to plaintiff that his investment would be in
the nature of a loan -- fail for the fundamental reason that any

reliance on the misstatements he alleges was unreasonable as a matter of law, given the innumerable disclaimers in the offering materials.

An absence of justifiable reliance defeats a securities fraud claim, and because this element involves inquiry into what a reasonable investor should have done, plaintiff's professed financial cluelessness is beside the point if he acted unreasonably.  It is unreasonable as a matter of law "for a plaintiff to claim to have relied on oral misrepresentations that are contradicted in written offering materials."  Spain v. Deutsche Bank, 2009 WL 3073349, at *3 (S.D.N.Y. Sept. 18, 2009) (citing cases); accord, e.g., Dodds v. Cigna Sec., Inc., 12 F.3d 346, 351 (2d Cir. 1993) ("Nor can a plaintiff rely on misleading oral statements to establish [a claim that a recommended investment was unsuitable] when the offering materials contradict the oral assurances."); Good Hill Partners L.P. v. WM Asset Holdings Corp. CI 2007-WM2, 583 F. Supp. 2d 517, 520 (S.D.N.Y. 2008) ("[A] reasonable investor would have familiarized [himself] with the potential for loss disclosed in the prospectuses, rather than relying on the oral assurances of brokers." (alteration in original; internal quotation marks omitted)); Feinman v. Schulman Berlin & Davis, 677 F. Supp. 168, 170 (S.D.N.Y. 1988) ("Reliance on statements which are directly contradicted by the clear language of the offering memorandum through which plaintiffs purchased their securities cannot be a basis for a federal securities fraud claim.").

Here, to the extent that plaintiff claims he was orally assured that his investment was in the nature of a "loan," any

reliance on such statements was unreasonable because the written offering materials unambiguously demonstrate the true nature of his investment, are replete with disclaimers as to the risks associated with the investment, and present detailed descriptions of the securities that are plainly inconsistent with an understanding of the investment as a loan with fixed interest payments.  Among much else, the Brochure clearly explains that these are speculative investments in a proposed real estate project.  Indeed, the Brochure contains two boldface disclaimers in all capitals, one stating that "**AS WITH ANY REAL ESTATE INVESTMENT, THERE CAN BE NO ASSURANCE OR GUARANTEE THAT THE COMPANY WILL MEET ITS BUSINESS OR INVESTMENT OBJECTIVES,**" Brochure at 18, and the other stating that the "**INVESTMENT AND DEVELOPMENT PROGRAM IS SPECULATIVE AND ENTAILS SUBSTANTIAL RISKS. SINCE MARKET RISKS ARE INHERENT IN ALL REAL ESTATE INVESTMENTS TO VARYING DEGREES, THERE CAN BE NO ASSURANCE THAT THE INVESTMENT OBJECTIVES . . . WILL BE ACHIEVED,**" id. at 19.

The Brochure further explains that investments in the project will be divided (equally in plaintiff's case) between two sorts of interests, "Class A" and "Class B," each with its own PPM.  Id. at 2. Although the Brochure references the PPMs for a more detailed description of the rights and obligations pertaining to each Class, it makes clear that neither Class is a loan.  Rather, the two Classes are described as roughly akin to common and preferred stock: holders of Class A interests receive "a 40% share of the total net proceeds

. . . upon completion of the project and sale of the condominium units," while Class B investors are entitled to "a 15% annual preferred return on their investment payable on a semi-annual basis." Id.[5]  The PPMs for each class also contain disclaimers like those in the Brochure, including one on their cover pages warning that "**THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK.**"  See Class A & Class B PPMs (Geibel Cert. Ex. A, Tabs 2 & 3).  The PPMs go on to state that distributions to both classes of interests are in the "sole discretion" of Metro GM and contingent on there being sufficient cash flow to make the distributions.  See Class A PPM at 12, 35; Class B PPM at 12.

The written representations in the Brochure alone, let alone those in the PPMs, are sufficient to render unreasonable as a matter of law any reliance by plaintiff on the alleged statements by his broker that his investment was in the nature of a three-year loan with annual interest payments of fifteen percent.  This holds true even if the Court were to grant leave for plaintiff to amend his complaint to include the allegation -- raised for the first time in his opposition papers and supporting affidavit[6] -- that he never

_____

[5] It should be noted that to the extent plaintiff characterizes the offering documents as somehow guaranteeing him a 15% annual return, such allegations would appear to pertain only to the half of his investment that was allocated to Class B.

[6] "[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss."  O'Brien v. Nat'l Prop. Analysts Partners, 719 F. Supp. 222, 229 (S.D.N.Y. 1989).

received the PPMs until his lawyer presented them to him in 2009.
Kosovich Opp. Aff. ¶ 10.  For one thing, this representation is
contradicted by the fact that, in connection with making the
investment that is the subject of this complaint, plaintiff
undisputedly executed documents indicating that he had received the
PPMs and other offering materials.  Geibel Cert. Ex. D at 1, 6.
Moreover, even if it were true that plaintiff did not consult the
PPMs prior to making his investment, his failure to do so was
eminently unreasonable.  Most fundamentally, the Brochure, which
plaintiff acknowledges he did receive, expressly mentions the risks
of the investment and includes the boldface disclaimers quoted above.
Thus, plaintiff's professed belief that he was making a $1 million
loan is unreasonable based on the contents of the Brochure alone.

        The securities fraud claims also fail for the independent
reason that they are time-barred.  The applicable statute of
limitations, 28 U.S.C. § 1658(b)(1), provides that private actions
under the Securities Exchange Act must be brought within two years of
the fraud's discovery.  The limitations period commences "when the
plaintiff 'obtains actual knowledge of the facts giving rise to the
action or notice of the facts, which in the exercise of reasonable
diligence, would have led to actual knowledge.'"  Shah v. Meeker, 435
F.3d 244, 249 (2d Cir. 2006) (emphasis added) (quoting Kahn v.
Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1042 (2d Cir. 1992)).
As plaintiff acknowledges in the complaint, the partial interest
payments he received within the first year of making his investment

fell far short of the allegedly promised 15% return.  Because a reasonable investor in such circumstances would have made inquiries as to why the promised interest payments for the year were not received in full, plaintiff must be deemed to have discovered the fraud as of January 2007 at the latest.  Accordingly, the two-year statute of limitations applies to bar his claims under the federal securities laws.

As if all this were not enough, several other necessary elements of a securities fraud claim are lacking in plaintiff's complaint.  In securities fraud actions, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  The complaint makes only the faintest gestures toward pleading the necessary fraudulent intent, and certainly does not plead facts showing that an inference of scienter is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007).  Although plaintiff makes the conclusory statement that "defendants knew that the representations . . . were false and misleading," Compl. ¶ 50,[7] the only facts pleaded along these lines are bare allegations, based only on information and belief, that UBS and Trump received unspecified "payments" for their involvement in the project, see id. ¶¶ 31, 33.  These allegations are deficient

---

[7] This citation refers to the second of two paragraphs numbered "50."

because they are unaccompanied by "a statement of facts upon which the belief is founded." <u>Stern v. Leucadia Nat'l Corp.</u>, 844 F.2d 997, 1003 (2d Cir. 1988).  But even if they were properly pleaded, they fall far short of creating a strong inference that defendants acted with intent to "deceive, manipulate, or defraud." <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 (1976).

The complaint is similarly infirm in its failure to plead loss causation: it fails to present any allegations that "'the <u>subject</u> of the fraudulent statement or omission was the cause of the actual loss suffered,' <u>i.e.</u>, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." <u>Lentell</u>, 396 F.3d at 173 (citation omitted).  According to the complaint, plaintiff's losses were a direct result of the project's failure to generate cash flow or turn a profit, <u>see</u> Compl. ¶¶ 52-53, not defendants' misrepresentations.  While a plaintiff might be able to satisfy this element by alleging that the risks that materialized were "within the zone of risk concealed" by the misrepresentations and omissions alleged, <u>Lentell</u>, 396 F.3d at 173 (emphasis omitted), the complaint here makes no effort to do so.

For each and all the above reasons, the securities fraud claim (Count I), to the extent it rests on allegations that plaintiff was misled into thinking that his investment in Harborspire was in the nature of a loan, must be dismissed with prejudice.  To the extent that any ancillary allegations of misrepresentation or

13

omission can be gleaned from the complaint, they too must be dismissed.  First, for the reasons discussed above, the complaint does not allege any actionable statements or omissions by the Trump Defendants.  Second, the allegations of misrepresentations or omissions in the PPMs are without merit.  If plaintiff is to be taken at his word that he never saw the PPMs until 2009, there is no way he could have relied on these documents when he made his investment in 2005.  In any event, the complaint's allegations of misrepresentations and omissions in the offering materials, see Compl. ¶¶ 32-33, are belied by the materials themselves.  The Brochure explains the division of investments among classes (Brochure at 2), and the PPMs and other documents referenced therein elaborate on the terms of investments in each class.  See, e.g., Class B PPM at 12 (citing Operating Agreement at 3 (Geibel Cert. Ex. A, Tab 4)); id. at 30-39 (citing the contingencies that could affect distributions to both classes).  In addition, the Brochure contains a footnote disclosing the licensing agreement between Trump and Metro Homes and provides projections of the costs and revenues associated with the project.  Brochure at 6-8, 16 n.1.  Finally, to the extent the complaint characterizes the Harborspire offering as illegally unregistered or plaintiff as an unqualified investor in such an offering, it is utterly devoid of reference to facts or law that would support this conclusion.[8]

_____

    [8] Indeed, in a questionnaire that he filled out in connection with his Harborspire investment, plaintiff represented that his net worth was over $1 million, see Geibel Cert. Ex. D at

The remaining state law counts in the complaint are likewise fatally deficient.  To begin with, the state-law fraud and misrepresentation claim (Count III) fails with respect to the misrepresentations and omissions alleged because, as described above, the elements of reasonable reliance, scienter, and loss causation are not remotely established.  See, e.g., May Dep't Stores Co. v. Int'l Leasing Corp., 1 F.3d 138, 141 (2d Cir. 1993) ("The elements of a fraud claim under New York law are 'a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff.'"); see also Fezzani v. Bear, Stearns & Co., 592 F. Supp. 2d 410, 423 (S.D.N.Y. 2008) ("Courts in the Second Circuit have found that the 'elements of common law fraud are essentially the same as those which must be pleaded to establish a claim under § 10(b) and Rule 10b-5.'").

Further, the breach of contract claim (Count II) is flawed because of plaintiff's failure to identify with any specificity the terms of the contract that was allegedly breached.  E.g., Chrysler Capital Corp. v. Hilltop Egg Farms, Inc., 514 N.Y.S.2d 1002, 1003 (App. Div. 1987).  Nor, in any event, can plaintiffs point to any such contractual terms in connection with the Harborspire investment, because the offering documents make clear that the distributions to holders of Class B interests are contingent on sufficient cash flow and in the discretion of the general manager.  Similarly, plaintiff's

---

11, which established him as a "qualified investor" for purposes of Regulation D offerings, see 17 C.F.R. § 230.501(a)(5) (2005).

allegations of "monies loaned" (Count IV) must be dismissed because the offering documents make clear that the investment was not a loan.

Finally, the complaint's theories of unjust enrichment and monies had and received (Count V) are quasi-contractual in nature, and therefore cannot proceed in the face of the express contracts governing plaintiff's relationship with the Metro Homes and UBS Defendants.  In any event, there was no unjust retention of a benefit here, where plaintiff's loses were consistent with the express terms of his investment.

For the foregoing reasons, plaintiff's complaint must be dismissed in its entirety and with prejudice.  See S.S. Silberblatt, Inc. v. E. Harlem Pilot Block Bldg. 1 Housing Dev. Fund Co., 608 F.2d 28, 42 (2d Cir. 1979).  The Clerk of the Court is directed to enter final judgment dismissing the complaint with prejudice and to close all open documents on the docket of this case.

SO ORDERED.

Dated: New York, NY
       December 29, 2009            JED (S) RAKOFF, U.S.D.J.

16